NOT FOR PUBLICATION

United States District Court
for the District Of New Jersey

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        Plaintiff,<br><br>  v.<br><br>ALSOL CORPORATION; SB BUILDING ASSOCIATES, LIMITED PARTNERSHIP; SB BUILDING GP, L.L.C.; UNITED STATES LAND RESOURCES, L.P.; UNITED STATES REALTY RESOURCES, INC.; LAWRENCE S. BERGER; 3.60 ACRES OF LAND<br><br>        Defendants. | Civil No.: 13-0380 (KSH)<br><br><br><br><u>OPINION</u> |

**Katharine S. Hayden, U.S.D.J.**

Presently before the Court are two contested motions. Plaintiff, the United States of America ("United States" or "government"), requests an order declaring that the *in personam* portion of its present lawsuit against certain of the defendants is not subject to the "automatic stay" provision of the United States Bankruptcy Code. [D.E. 7.] Meanwhile, defendants seek to overturn the default earlier entered against them. [D.E. 14.] Both motions will be granted.

**I.    Background**

A)  <u>The Lawsuit</u>

In January 2013, the government filed suit against defendants Alsol; SB-LP; SB-GP; Land Resources; Realty Resources; Lawrence S. Berger; and a piece of property—"3.60 Acres of Land, more or less"—in Middlesex County. The gist of the suit, brought under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), is that the defendants—interconnected or alter-ego corporations that share Berger as a decision-maker or partner—owe millions of dollars to the Environmental Protection Agency (EPA) for hazards

1

at the Middlesex property, which required the EPA to undertake "response" actions as defined by 42 U.S.C. § 9601(25). (*See, e.g.*, Compl. ¶¶ 51–67, 74–118.) The property, which the complaint divides into separate "Sites," is "part of the former Michelin Tire industrial facility." (Compl. ¶ 79.)

As an example of the claims alleged, the government contends with regard to the "Powerhouse Site" that a circa-2004 "Removal Site Evaluation" uncovered hazardous materials "such as friable asbestos, arsenic, lead, and mercury." (Compl. ¶¶ 80–81.) Although the EPA sent Alsol a letter notifying it of its potential liability for any removal action "and offering Alsol the opportunity to perform the necessary removal action or fund EPA's performance of the removal action," Alsol's compliance was allegedly only partial. (Compl. ¶¶ 84–85.) Later, in 2007, the EPA sought payment from Alsol for the response costs incurred pursuant to Section 107(a) (42 U.S.C. § 9607(a)) of CERCLA. (Compl. ¶ 87.) Subsequent letters were sent to Alsol and the other defendants in 2012. (Compl. ¶¶ 93–98.) However, the government as yet has "not been reimbursed." (Compl. ¶ 99.) All told, the government claims expenditures and costs of at least $3,107,900.43, *before* either interest or ongoing expenses are taken into account. (*See* Compl. ¶¶ 91, 110, 120.)

The complaint states two grounds for relief. In the *in personam* first claim, the government demands the reimbursement of response costs, contending that Alsol (as the "current owner of the facility") and the other defendants are "jointly and severally liable to the United States for all costs incurred in connection with the Sites" under 42 U.S.C. § 9607(a)(1). (Compl. ¶¶ 119–21.) In the second, an *in rem* claim under 42 U.S.C. § 9607(l)(4), the government alleges that "the costs incurred by the United States in this matter constitute a CERCLA lien upon the

real property which is subject to or affected by the response actions taken by [the] EPA with respect to the Sites, including 3.60 Acres of Land." (Compl. ¶¶ 122–25.)

      B)    <u>Bankruptcy Proceedings, the Automatic Stay, and the Government's Motion</u>

In February 2013, shortly after this lawsuit began (but before any defendants were served), two of the corporate defendants—Alsol and SB-LP, hereinafter the "debtor defendants"—filed for bankruptcy in this District,[1] which had legal implications for the present suit. Generally speaking, a pending bankruptcy proceeding automatically stays "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement" of the relevant bankruptcy action. 11 U.S.C. § 362(a)(1). However, this automatic bankruptcy stay is subject to several exceptions. *See Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 502–04 (1986).

The government now moves for an order declaring that the *in personam* ground one of the complaint—recovery of costs under CERCLA—falls into the automatic-stay exception for actions brought "by a government unit . . . to enforce [its] police and regulatory power, including the enforcement of a judgment other than a money judgment." 11 U.S.C. § 362(b)(4). As "controlling Third Circuit authority" for claiming the exception, the government relies on *United States v. Nicolet, Inc.*, 857 F.2d 202 (3d Cir. 1988). Explicitly circumscribing the scope of the order it is requesting, the government acknowledges that it would not be entitled to execute any judgment obtained against the debtor defendants while the bankruptcy actions are ongoing. Nor

---

[1] The government says that the defendants filed for Chapter 13 bankruptcy protection (*see* Pl.'s Moving Br. 1 [D.E. 7-1]), but the relevant dockets reflect Chapter 11 filings, at least initially. [*See* D.N.J. Bankr. No. 13-12682 D.E. 1; 13-12689 D.E. 1.]

3

does the government seek a ruling that the *in rem* action is exempt from the automatic stay. (Pl.'s Moving Br. 2 & n.1.)

The debtor defendants oppose the motion, challenging the government's reliance on *Nicolet*. They argue that because this lawsuit "is brought to fix damages for remediation that has already been completed," and because there is "no ongoing risk to the public" or "any environmental threat that currently exists at the Property," the "compelling public policy underlying the police and regulatory power exception to the automatic stay is not present in this case." (Defs.' Resp. Br. 4 [D.E. 15].) In its reply, the government disputes the debtor defendants' desire to distinguish *Nicolet* while pointing out that the EPA's CERCLA lien was "created long ago" in 2007. (*See* Pl.'s Reply Br. 4 & Ex. A [D.E. 16, 16-1].)

C) <u>The Default and the Motion to Vacate</u>

On March 20, 2013, a little more than two months after the government filed suit, returned summonses were entered on the docket. [D.E. 5.] Each reflected successful personal service upon the individual defendants. Each also contained a printed date and time of service: March 18 at around 5:20P.M. The documents were sworn and notarized the next day.

After the passage of a month with no response from the *in personam* defendants, *see, e.g.*, Fed. R. Civ. P. 12(a)(1)(A), the government moved for entry of default pursuant to Fed. R. Civ. P. 55(a). [D.E. 6.] The Clerk granted the request and entered the default on April 26, 2013. The government did not thereafter seek entry of a default judgment under Fed. R. Civ. P. 55(b).

Formal participation by the defendants began in late May, when their attorney entered his appearance on the docket. [D.E. 8.][2] Although correspondence initially focused on responding

---

[2] A replacement attorney took over in early July, right before the filing of the motion to vacate the default. [D.E. 13.]

4

to the government's automatic-stay request, the *in personam* defendants filed a motion to vacate the default on July 1. [D.E. 14.]

In their motion, filed pursuant to Fed. R. Civ. P. 55(c), defendants point out that service of the complaint was effected after bankruptcy proceedings had commenced, and that when Berger received the complaint, he forwarded it to bankruptcy counsel, who "reasonably believed . . . that [the automatic stay] served to stay this litigation." (Defs.' Moving Br. 2.)[3] Referencing the test for setting aside a default, defendants maintain that the government has suffered no prejudice and that they have a meritorious defense. They also dispute that the cleanup was necessary. In the alternative, "even if the cleanup was necessary, there is no honest argument that can support the government's contention that the costs that it seeks to collect were reasonable[] or necessary," because the defendants "were already proceeding to clean up the property, and had already spent hundreds of thousands of dollars cleaning up the property." (Defs.' Moving Br. 5–6.) Berger and his attorney Morris Bauer submit affidavits stating that they believed the present lawsuit was stayed by the ongoing bankruptcy proceedings. (*See* Bauer Decl. ¶ 3 [D.E. 14-3]; Berger Decl. ¶¶ 2–4 [D.E. 14-4].) Defendants also include a short memorandum from Berger to Bauer—dated March 18, *see supra* note 3—in which the former writes, "I guess they did not know we filed a bankruptcy. Can you please let them know." (Memo [D.E. 14-4].) Defendants do *not* attach a proposed answer to their motion.

The government's opposition disputes the meritoriousness of the proposed defense and the legitimacy of defendants' excuse for failure to appear. (Pl.'s Resp. Br. 1–6 [D.E. 17].) In the alternative, the government argues for a conditional denial without prejudice, predicated on the

---

[3] In an aside, defendants maintain that Berger was not available on March 18 and thus could not have been served on that date. Berger repeats this contention in his affidavit. (*See* Berger Decl. ¶ 5 [D.E. 14-4].) As defendants do not otherwise deny receiving the complaint, the Court will not interpret this as an attack on the form or propriety of service sufficient to negate the default.

timely filing of a proposed answer (containing a meritorious defense) by the defendants along with a renewed motion to vacate. (Pl.'s Resp. Br. 7.) The government attaches an e-mail it sent to attorney Bauer on March 21 to show that the defendants were aware of the government's position on the automatic stay. (*See* Mar. 21 e-mail [D.E. 17-1].) Defendants have replied via letter brief, in which they assert, among other things, that the government reneged on its promise to not oppose their motion to vacate the default. (*See* Defs.' Reply Br. 1 [D.E. 18].)

**II.     Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, as well as 42 U.S.C. § 9613(b). *See Agere Sys. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 216 (3d Cir. 2010); *United States v. Manzo*, 279 F. Supp. 2d 558, 561 (D.N.J. 2003) (Cooper, J.). Further, this Court has jurisdiction to determine the applicability of the automatic bankruptcy stay; "[t]he court in which the litigation claimed to be stayed is pending . . . 'has jurisdiction to determine not only its own jurisdiction but also the more precise question whether the proceeding pending before it is subject to the automatic stay.'" *Brock v. Morysville Body Works*, 829 F.2d 383, 387 (3d Cir. 1987) (quoting *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 347 (2d Cir. 1985)).

**III.    Discussion**

A)    The Applicability of the Automatic Bankruptcy Stay

1. *The* Nicolet *Case and Exceptions to the Automatic Stay*

To determine whether the 11 U.S.C. § 362(b)(4) exception to the automatic stay applies, the Court must decide 1) whether the *in personam* portion of this suit is an action or proceeding to enforce the government's police and regulatory power; and 2) if so, whether the relief requested by the government would amount to the enforcement of a money judgment. *See New*

*York v. Mirant N.Y., Inc.*, 300 B.R. 174, 178–79 (S.D.N.Y. 2003). The government argues that the Third Circuit's *Nicolet* precedent is directly on point, thereby compelling a result in the government's favor.

In *Nicolet*, a CERCLA suit brought by the government in relation to asbestos abatement in Pennsylvania, the district court originally assumed that an ongoing bankruptcy stayed the lawsuit. The court reconsidered and reactivated the case in light of the government's insistence that the CERCLA suit "was a suit by a governmental unit to enforce its police or regulatory power, a proceeding expressly exempt from the automatic stay under 11 U.S.C. § 362(b)(4)." *Nicolet*, 857 F.2d at 203. The defendants appealed.

In determining whether the stay applied, the Third Circuit summarized the purpose and history of both the automatic stay and its enumerated exceptions, one of which was to combat abusive practices by debtors:

> The automatic stay provision codified at section 362 of the Bankruptcy Code prohibits, inter alia, the commencement or continuation of a judicial or administrative proceeding against the debtor that could have been initiated before the petition was filed, or to recover on a claim that arose pre-bankruptcy. . . . In addition to providing the debtor with a "breathing spell," the stay is intended to replace an unfair race to the courthouse with an orderly liquidation procedure designed to treat all creditors equally. . . . Congress recognized, however, that the stay provision was particularly vulnerable to abuse by debtors improperly seeking refuge under the stay in an effort to frustrate necessary governmental functions. To combat the risk that the bankruptcy court would become a sanctuary for environmental wrongdoers, among others, Congress enacted the police and regulatory power exception to the automatic stay. . . . These provisions embody Congress' recognition that enforcement of the environmental protection laws merits a higher priority than the debtor's rights to a 'cease fire' or the creditors' rights to an orderly administration of the estate.

*Id.* at 207 (citations omitted).[4]  Nicolet argued that the regulatory-power exception applied prospectively, not retrospectively, and that "suits demanding money damages for past violations" should not be allowed to proceed.  *Id.* at 208.

The Third Circuit surveyed the legislative history and cases within and outside of this Circuit to determine whether the stay should apply.  One of those cases was *Penn Terra, Ltd. v. Department of Environmental Resources*, 733 F.2d 267 (3d Cir. 1984), in which the Circuit had analyzed the "exception to the exception" contained in the Bankruptcy Code: to wit, actions to "enforce money judgments" are not exempt from the stay, even if they otherwise fall under the police-power exception.  *Id.* at 272.  The *Penn Terra* decision emphasized the distinction between the *entry* of a police-powers money judgment, which was exempt from a stay, and the *enforcement* of one, which was not.  *See, e.g.*, *id.* at 275.  Applying *Penn Terra,* the *Nicolet* court concluded that "[t]hese considerations make it plain that the present action falls within the 'related to police or regulatory powers' category."  *Nicolet*, 857 F.2d at 208–10.  Moreover, the court used the *Penn Terra* rationale to find that no seizure of property takes place "[b]y simply permitting the government's claim to be reduced to a judgment," *Id.* at 209.  Thus, the Third Circuit held "that it was Congress' intent that proceedings such as this be exempt from the automatic stay up to and including entry of a monetary judgment[; a]ccordingly, the district court did not err in lifting the stay."  *Id.* at 210.

---

[4] When *Nicolet* was decided, what is now codified as 11 U.S.C. § 362(b)(4) was split between § 362(b)(4) and (b)(5)—thus "these provisions" and not "this provision" in the quoted selection. Because the revised § 362(b)(4) is "roughly the equivalent of combining the[] two [prior] sections into one section of the Bankruptcy Code," pre-revision cases remain good law. *In re Burns*, No. 5-BK-07-50140, 2008 WL 3246244, at *2 n.4 (Bankr. M.D. Pa. Aug. 7, 2008); *see In re Mohawk Greenfield Motel Corp.*, 239 B.R. 1, 5 n.6 (Bankr. D. Mass. 1999).

2. *Applying* Nicolet

The parallels to this suit are clear. The EPA here conducted its alleged response activities pursuant to 42 U.S.C. § 9604, the same statute relied upon by the government in *Nicolet*. *See id.* at 203. There, as here, the government was seeking reimbursement for funds spent to clean up a site. *See id.* Ergo, *Nicolet* establishes that the automatic stay does not affect the *in personam* portion of this suit.

In so deciding, the Court rejects the debtor defendants' arguments that *Nicolet* is distinguishable. (*See generally* Defs.' Resp. Br. 4–7.) First, the debtor defendants' attempt to cabin *Nicolet* on the basis of a forward-looking versus retrospective distinction ignores that *Nicolet* dealt purely with a remedial remedy. Although the government's suit in *Nicolet* contained prospective components, *see Nicolet*, 857 F.2d at 203, the Third Circuit examined only "expenses for past activities," *id.* at 207. The Court's discussion of policy, of legislative history, and of the relationship of the lawsuit to the bankruptcy process was a searching analysis of the automatic-stay exceptions as applied to a suit for damages arising out of a CERCLA environmental-response activity; that future violations could conceivably occur did not form the basis of the Court's reasoning. Significantly, each of the debtor defendants' arguments in this case that pertain to the policy rationale behind a stay was considered and rejected in the *Nicolet* decision.

*Nicolet* is not an outlier case.[5] Other courts confronting similar fact patterns have concluded that CERCLA remedial money suits are exempt from automatic bankruptcy stays. In *New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir. 1991), for instance, New York State brought

---

[5] Although *Nicolet* has been criticized in the case law, such criticism appears generally to have been directed at the opinion's jurisdictional holding, which preceded discussion of the merits. *See, e.g.*, *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1284–85 (2d Cir. 1990) (declining to follow the *Nicolet* rule regarding automatic-stay appeals).

suit under CERCLA "to recover the costs of removing from several of its landfills certain hazardous substances contained in industrial wastes." *Id.* at 1022. Relying in part on *Nicolet*, the Second Circuit held "that governmental actions under CERCLA to recover costs expended in response to completed environmental violations are not stayed by the violator's filing for bankruptcy." *Id.* at 1024. In fact, "every court that has considered the question has determined that environmental enforcement actions fall within the police and regulatory exception of § 362(b)(4), *even when the agency seeks its response costs*." *United States v. Acme Solvents Reclaiming, Inc.*, 154 B.R. 72, 74 (N.D. Ill. 1993) (emphasis added); *see also United States v. LTV Steel Co.*, 269 B.R. 576, 583–85 & n.8 (W.D. Pa. 2001).

*Penn Terra* does not compel an alternative or modified outcome. Although *Nicolet* incorporated the *Penn Terra* discussion about "enforcement of a money judgment," *Nicolet*, 857 F.2d at 208, the government does not seek to "enforce" the judgment it obtains from the *in personam* portion of its suit outside of the confines of the bankruptcy proceeding. *Penn Terra* specifically acknowledged that suits that can be fairly read to contain both equitable and enforcement qualities are not necessarily barred by the automatic stay. *See Penn Terra*, 733 F.2d at 278.

### 3. *The Automatic Lien*

Finally, 42 U.S.C. § 9607(l), the automatic lien provision that was added to the statute in 1986,[6] converts "[a]ll costs and damages for which a person is liable to the United States under [42 U.S.C. § 9607(a)]" into "a lien in favor of the United States" on "all real property" belonging to the defendant that was "subject to or affected by a removal or remedial action." 42 U.S.C. § 9607(l)(1). The lien is created when "costs are first incurred by the United States with respect

---

[6] *See* Superfund Amendments and Reauthorization Act of 1986, Pub L. No. 99-499, 100 Stat. 1613.

10

to a [CERCLA] response" or when a potentially liable person is provided notice of the possible liability, whichever is later. 42 U.S.C. § 9607(l)(2). The statute further provides that "[t]he costs constituting the lien may be recovered in an action *in rem* in the United States district court for the district in which the removal or remedial action is occurring or has occurred." 42 U.S.C. § 9607(l)(4).

The debtor defendants argue that the very creation of the lien:

> constitute[s] the "enforcement of a money judgment" which is prohibited by section 362(b)([4]) of the Bankruptcy Code. The placement of a retroactive lien on all real property owned by the Debtor Defendants is an enforcement mechanism "in common understanding" and under its "settled meaning equity and the common law." *Penn Terra*, 733 F.2d at 275.

(Defs.' Resp. Br. 7.) Thus, they contend, the automatic stay must apply because the costs to be recovered in the *in personam* portion of the suit will necessarily involve an impermissible encumbrance on their property.

The Court disagrees. The *in personam* CERCLA claim, brought in ground one of the complaint pursuant to 42 U.S.C. § 9607(a)(1), does not "create, perfect, or enforce" the § 9607(l) lien. (Pl.'s Reply Br. 4.) Rather, as the statute specifies, the lien arises at the time costs are first incurred. Thus, the lien here was created in 2007. To the extent that the *in personam* portion of the suit brought pursuant to § 9607(a)(1) affects the previously created lien, it serves to define its boundaries—to fix it as something upon which the government can recover, which appears to be the intent of the statutory framework. CERCLA contemplates a separate *in rem* action to recover "[t]he costs constituting the lien." 42 U.S.C. § 9607(l)(4). The government has filed an *in rem* claim and does not seek to exempt that claim from the automatic bankruptcy stay. As a result, obtaining a judgment pursuant to § 9607(a)(1) does not run afoul of the general principles articulated in *Nicolet*.

4. *The Automatic Bankruptcy Stay Does Not Bar the Government's Suit*

For the foregoing reasons, the Court holds that the automatic bankruptcy stay does not apply to ground one of the government's lawsuit against the debtor defendants. Although the *in rem* claim will be stayed, the *in personam* claim will be allowed to proceed.

B) Motion to Set Aside the Default

The defendants seek to set aside the default entered against them pursuant to Fed. R. Civ. P. 55(c). An entry of default may be set aside "for good cause." Fed. R. Civ. P. 55(c). In exercising its discretion to determine the presence of "good cause," the Court is required to consider "1) whether the plaintiff will be prejudiced[,[7]] (2) whether the defendant has a meritorious defense[,] [and] (3) whether the default was the result of the defendant's culpable conduct." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984); *see also World Entm't Inc. v. Brown*, 487 F. App'x 758, 761 (3d Cir. 2012) (nonprecedential) (quoting *Currency*). This test sometimes contains a fourth requirement, especially in the context of refusing to lift a default: "the effectiveness of alternative sanctions." *See Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 73 (3d Cir. 1987). "Other relevant equitable factors may also be considered, for instance, whether the failure to follow a rule of procedure was a mistake made in good faith and whether the entry of default would bring about a harsh or unfair result." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993).

Setting aside a default under Fed. R. Civ. P. 55(c) requires a lesser showing than does vacating a default judgment under Fed. R. Civ. P. 60(b). *Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 656 (3d Cir. 1982). Because defaults and default judgments are disfavored in this Circuit, *cf. Budget Blinds, Inc. v. White*, 536 F.3d 244, 258 (3d Cir. 2008), "doubts should be

---

[7] The government concedes that the delay thus far does not amount to substantial prejudice. (*See* Pl.'s Resp. Br. 3 n.3.)

resolved in favor of setting aside the default and reaching a decision on the merits." *Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 122 (3d Cir. 1983). Unsurprisingly, the parties do not agree on whether the first relevant consideration, the assertion of a meritorious defense, *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984), has been met—a problem exacerbated by defendants' failure to file a proposed answer (discussed further below). At this point, their objections to the amounts assessed by way of costs are necessarily conclusory. But given the complex statutory scheme at work and the government's concession that the monies assessed and the actions taken by the EPA are subject to challenge (if under a deferential standard of review, *see* Pl.'s Resp. Br. 5), the Court cannot conclude that the proposed defenses are categorically without merit. Moving to the mandatory "culpable conduct" element, the record reveals that the defendants were aware of the government's position on the automatic stay and of *Nicolet* in particular, suggesting that their confidence in a favorable legal outcome is not a valid reason for their failure to timely respond to the civil action served on them. However, the Third Circuit has discussed culpability in the context of willfulness and bad faith. *Hritz*, 732 F.2d at 1182. The Court is unwilling to characterize defendants' actions as manifesting willfulness as opposed to negligence. *Cf. id.* at 1183. As a practical matter, the size of the proposed judgment means that defendants' mere failure to timely answer would incur a multi-million-dollar penalty—a harsh and disfavored outcome. *See Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 245 (3d Cir. 1951) ("Matters involving large sums should not be determined by default judgments if it can reasonably be avoided.").

Thus, the Court will enter an order vacating the default against defendants, with specific conditions. The default is not yet cured because defendants have failed to attach or otherwise file a proposed answer. By accompanying order, they will be required to submit their proposed

13

answer within ten days of the entry of the order accompanying this opinion. In the event they fail to do so, the government may request that default be reinstated as to the named defendants and move for default judgment pursuant to Fed. R. Civ. P. 55.

**IV.    Conclusion**

The Court grants both pending motions. An appropriate order will be filed.


January 2, 2014                                             /s/ Katharine S. Hayden
                                                            Katharine S. Hayden, U.S.D.J.